UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ALICIA CARTER,

                       Plaintiff,

      - v -

THE CITY OF NEW YORK, et al.,

                       Defendants.
-------------------------------------------------------------x

**DECISION AND ORDER**

CV-11-2899 (WFK)(VVP)

      The defendants have moved for sanctions against the plaintiff Alicia Carter based on the plaintiff's alleged untruthfulness at her deposition. Specifically, the defendants seek reimbursement for the costs of a private investigator they hired in an effort to locate a non-party witness, Andre Dedmon, in order to serve a subpoena on him to obtain his deposition testimony. They hired the investigator after the plaintiff testified in her deposition that she had not spoken to him for quite some time and had no idea how to contact him. When later deposition testimony by her younger brother, a minor who will be referred to here as Q.S., directly contradicted the plaintiff's testimony about the plaintiff's recent contacts with Dedmon, the defendants brought this motion.

      This action arises from the plaintiff's arrest on October 5, 2010 following an incident involving Q.S. at his school. When the plaintiff and Dedmon, who was her boyfriend at the time, arrived at the school that day, they encountered various school safety officers who were in the process of removing Q.S. from the school in handcuffs. The parties dispute precisely what happened at that point, but both the plaintiff and Dedmon were themselves arrested and charged with various offenses. Dedmon eventually pleaded guilty to obstructing governmental administration and was sentenced to 10 days of imprisonment. The plaintiff's

charges were ultimately resolved by an adjournment in contemplation of dismissal in April 2011.

As Dedmon was obviously an eyewitness to the events that led to both his and the plaintiff's arrest, the defendants were interested in obtaining deposition testimony from him. To that end, they sought to obtain information about his whereabouts from the plaintiff in a deposition on February 8, 2012. The plaintiff disclaimed all knowledge about how Dedmon might be located. She testified that their relationship ended amicably around Valentine's Day a year earlier because they had different goals in life. She said that she had spoken to him on occasion thereafter by telephone, but that the last time she had spoken to him was in the summer of 2011 before she lost her cell phone in a sewer. At one point during her testimony she said, "I don't even know where he would be." Carter Dep. Tr. at 23:22.[1] At another, in response to a question about whether she knew any way she would be able to contact him, she said, "I have no idea." *Id*. at 26:8.

The testimony by her younger brother Q.S., who is 13 years old, approximately six weeks later on March 22, 2012 directly contradicted Carter's testimony concerning her contacts with Dedmon and her knowledge of his whereabouts. When asked who lived with him aside from his mother and the plaintiff, Q.S. offered without any prompting that Dedmon was living at the address, and had been living there for five or six months. He saidi

---

[1]"Carter Dep. Tr." refers to the transcript of the deposition of Alicia Carter, taken on February 8, 2012, the relevant portion of which may be found at docket entry 11. The numerical notation refers to the page and line number of the deposition transcript, the number before the colon beng the page number, and the number after the colon, the line number.

that he saw Dedmon "every day mostly," although Dedmon did go to his own mother's house "off and on." Q.S. Dep. Tr. at 10:13 and 6.[2]

In order to assess the credibility of the plaintiff and the reliability of Q.S.'s testimony in light of the direct contradictions between his testimony and his older sister's, the court held a hearing on April 23, 2012 at which they both testified. In addition, the plaintiff called her mother, Cheryl Boatwright, in an effort to corroborate her own testimony.

The plaintiff's testimony only raised further questions about her credibility. In contrast to her deposition testimony concerning an amicable breakup with Dedmon in February 2011, she revealed that she had filed a domestic incident report charging him with harassment some six months later on August 11, 2011. She insisted at one point that Dedmon had never lived with her, but at another point testified that in or about August 2011 the police were called to her home to escort Dedmon, along with his belongings, from the apartment. Despite her deposition testimony that she had no idea how to contact Dedmon, she now admitted that she had seen him from time to time after August 2011 in the neighborhood. She conceded that, after her deposition but before Q.S.'s, Dedmon and she had resumed their relationship briefly, and that he had stayed with her twice a week for a total of 12 times or so during that period. She attributed Q.S.'s "confusion" about the nature and duration of her relationship with Dedmon to this brief period of rapprochement.

Although Q.S.'s testimony at the hearing retreated a little from the testimony at his deposition with respect to whether Dedmon lived at the apartment and the nature of

---

[2]"Q.S. Dep. Tr." refers to the transcript of the deposition testimony of Q.S. taken on March 22, 2012, the relevant portions of which may be found at docket entry 12.

Dedmon's relationship with his sister, he continued to maintain that Dedmon had regularly been at the apartment during the five- to six-month period prior to his deposition, testifying as follows:

> Q. Mr. S., you also testified that during that five or six month period before March 22nd, 2012, Andre Deadman [sic] stayed at your apartment approximately five days per week. Was that a true statement?
>
> A. Yes, it was. He – he would – he wouldn't be there the whole entire day because of course he would go to this other house, but he would be there off and on every week.
>
> Q. Okay. You also testified, Mr. Summers, that in the five or six months before March 22nd, 2012, that you saw Andre Deadman every day. Was that a true statement?
>
> A. Not every single day, I said, but I seen him a couple of times each week.

Tr. at 50:4-15.[3] To the extent that his testimony at the hearing retreated from his deposition testimony, it is likely attributable to a conversation Q.S. testified that he had with the plaintiff a week before the hearing in which she told him that his deposition testimony had been wrong:

> Q. I see. Did – at any point did she tell you that something you said during your deposition was not true?
>
> A. Yes, she did.
>
> Q. What did she tell you?
>
> A. She told me that – that Andre doesn't stay – stay at our house.
>
> Q. You say she told you that Andre didn't stay at your house?

---

[3] "Tr." refers to the transcript of the hearing held before the court on April 23, 2012.

> A. Yes. She told – at – at first I did not know – I did not know that he wasn't staying at our house. He was just going to be there off and on because I didn't (indiscernible) the status of their relationship.

Q.S. Dep. Tr. at 55:5-16. Of course this change in Q.S.'s understanding brought about by his conversation with the plaintiff does not undercut the essence of his testimony that Dedmon was a regular presence in his and the plaintiff's home at the time of, and in the months before, her deposition on February 8, 2012.

The testimony offered by the plaintiff's mother, Cheryl Boatwright, was not helpful to the plaintiff's position. In contrast to both the plaintiff's testimony and her son's testimony, she testified that she was unaware that Dedmon had been at her home some twelve times between February 8 and March 22, and vehemently disputed that he was living at the residence on March 22 or that he had ever lived at the residence. She adamantly maintained that Dedmon had not been in her home. Tr. at 67. Yet her son, when asked when he had last seen Dedmon, testified as follows:

> Q. Mr. Summers, when was the last time you saw Andre Deadman?
>
> A. Couple days ago.
>
> Q. Where'd you see him?
>
> A. Seen him at my house.
>
> Q. He was at your house?
>
> A Yes.
>
> Q. Do you know why he was at your house?
>
> A. No. *I think he was talking to my mom.*

>    Q. Was your sister there; do you know?
>
>    A. I don't remember.

Tr. at 51:8-16 (emphasis added).  There is no question about the fact that Q.S. has had contact with Dedmon, even after his deposition, because he disclosed that Dedmon had been questioning him about the testimony he gave at his deposition.  Tr. 51:8 to 52:11.  This testimony undercuts substantially the impression Boatwright sought to convey, i.e., that Dedmon has not, and could not have, been regular presence in her home at the times in question.

The court found the testimony by Q.S. to be entirely reliable on the key point: the regular and sustained presence of Dedmon in his home when his sister, the plaintiff, gave her deposition testimony.  In contrast, because of the internal discrepancies in the plaintiff's testimony and the contradictions between her testimony and that of Q.S., the plaintiff's testimony lacks credibility on the point.  The court therefore concludes that the plaintiff deliberately gave false testimony in her deposition, and during the hearing, about her contacts with Dedmon and about her knowledge of how and where he could be found.  Regardless of whether Dedmon was still living with her or was simply a regular visitor two to five times per week at the time of her deposition, it is clear to the court that the plaintiff deliberately lied about the nature and frequency of her contacts with Dedmon in an effort to prevent the defendants from locating him.  There is no question that she would have such a motive, because she herself recognized the liabilities he posed as a witness given that he pleaded

guilty for his conduct during the incident when the plaintiff was arrested. Carter Dep. Tr. at 25:19 to 26:5.

The sanction proposed by the defendants for this false testimony is not appropriate, however. Notwithstanding the plaintiff's falsehoods, it is not clear that the defendants could have avoided hiring a private investigator in order to serve a subpoena on Dedmon. The defendants would have difficulty establishing that the plaintiff's home is an appropriate residence for purposes of service of such a subpoena – neither the plaintiff nor her mother would have been likely to have accepted service on his behalf. Thus, the defendants would have been forced to retain an investigator to conduct the inquiries that are reflected in the invoice they submitted to the court even if the plaintiff had been truthful.

A sanction for the plaintiff's conduct is nevertheless required, because false testimony under oath cannot be ignored. An appropriate sanction is suggested by Rule 37(c)(1)(B) of the Federal Rules of Civil Procedure, which permits the court to inform the jury of a party's failure to provide information in discovery. It is not clear that this provision strictly applies to the plaintiff's conduct here, since by its terms it applies to failures to disclose information required by Rule 26(a) and (e), and the question whether the information withheld by the plaintiff here falls within those provisions is subject to debate. But the failure to provide the information is akin to spoliation of evidence, for which a similar remedy is also warranted in comparable situations. The plaintiff's conduct was intended to prevent the defendants from obtaining evidence, and in that respect is identical, both in motivation and in effect, to a party's conduct in destroying documents or other physical evidence. Where a party prevents

an adversary from obtaining physical evidence that would be relevant to the adversary's defense by intentionally destroying it, an adverse inference instruction may be given to the jury. *See, e.g., Residential Funding Corp. v. Degeorge Financial Corp.*, 306 F.3d 99, 107-08 (2nd Cir. 2002).

Such an instruction would be warranted here. Should there be a trial, the jury should be informed that the plaintiff intentionally misled the defendants about how Dedmon could be located in order to prevent them from obtaining his testimony, and that they are allowed, but not required, to assume that his testimony would have been adverse to the plaintiff.

The defendants' motion for sanctions is granted in part and denied in part in accordance with the above decision.

SO ORDERED:

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
June 23, 2012